Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **MIGUEL A REYES-MARCELINO, as Administrator of the Estate of MIGUEL A. REYES, and as Guardian of the Property of MIGUEL A. REYES, JR., an infant,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CONNOR NUTLAND, *et al.*,[1]**<br><br>**Defendants.** | Civil Action No. 16-6774 (ES) (MAH)<br><br>OPINION |

SALAS, DISTRICT JUDGE

This dispute arises from the fatal shooting of Miguel A. Reyes by Defendant Connor Nutland, a police officer for the Borough of Paramus, in the early morning hours of October 8, 2014. Initially, Officer Nutland fired nine shots at Reyes while he fled the scene of a reported break-in, and later fired one shot more after Reyes crashed into a nearby building. Reyes's father, Plaintiff Miguel A. Reyes-Marcelino, brought suit against Officer Nutland for excessive force and wrongful death on behalf of Reyes and Reyes's minor child, Miguel A. Reyes, Jr. (D.E. No. 1 ("Compl.") ¶¶ 26–29 & 36–40). Officer Nutland moves for summary judgment. (D.E. No. 85). Having reviewed the parties' submissions, the Court decides the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons that follow, Officer Nutland's motion is **GRANTED in-part** and **DENIED in-part**. In particular, the Court finds that

---

[1]      Plaintiff initially brought additional claims against the Borough of Paramus, which Plaintiff voluntarily dismissed on March 14, 2019. (D.E. No. 58). Connor Nutland is the only remaining Defendant in this action.

Officer Nutland is entitled to qualified immunity for the initial nine bullets. As to the final bullet, there are genuine disputes of material fact that must be determined by a jury.

## I.    BACKGROUND[2]

Unless otherwise noted, the following facts are not disputed. In the early morning of October 8, 2014, Reyes and three other men, Hector Felix, Josue Felix, and Nico Vega,[3] traveled in a Kia car to a strip mall near Route 4 in Paramus, New Jersey, with the intent to commit a burglary. (Resp. SMF ¶¶ 5–7). Reyes drove the other men to the strip mall, and Hector, Josue, and Nico broke into a Jennifer Convertibles store, which was two doors down from a T-Mobile store. (*Id.* ¶¶ 6 & 11–12). Nico and Josue broke a hole in the wall that was connected to a vacant store in between Jennifer Convertibles and T-Mobile. (*Id.* ¶ 13). When the break-in triggered an alarm, the four men left the strip mall and drove to a nearby restaurant where they attempted to see whether police responded to the scene. (*Id.* ¶¶ 14 & 17).

After the four men left the scene, Officers Nutland and Anthony Liggio arrived at the scene in separate vehicles. (*Id.* ¶¶ 16 & 22). The officers saw the open door with pry marks and the large hole in the wall of the Jennifer Convertibles store, and they confirmed with dispatch that a break-in had occurred. (*Id.* ¶¶ 19–21). While Officer Liggio waited in his parked car in front of the Jennifer Convertibles store, Officer Nutland circled the perimeter and headed down an alleyway between the T-Mobile store and the neighboring strip mall. (*Id.* ¶¶ 22 & 30–31).

At the same time, the four men drove to the back of the neighboring strip mall and Reyes backed the Kia into a parking space behind a Sleepy's store. (*Id.* ¶¶ 23–25). The parking space was between the alleyway and a dumpster, specifically the last of several parking spaces directly

---

[2]    The Court gathers the following facts primarily from Officer Nutland's statement of material facts and Plaintiff's responses to same, as well as the parties' respective supplemental statements of facts. (D.E. No. 87 ("Resp. SMF"); D.E. No. 102-1 ("Pl. Supp. SMF"); D.E. No. 100-2 ("Def. Supp. SMF")).

[3]    The Court will refer to these individuals by their first names for clarity.

next to the dumpster.  (*See* D.E. No. 102-3, Plaintiff's Diagram of Scene).  There was "a little

space" between the Kia and a guardrail behind the parking spaces.  (Pl. Supp. SMF ¶¶ 11–12; Def.

Supp. SMF ¶¶ 12–13).

Hector, Josue, and Nico exited the Kia and headed toward the Jennifer Convertibles store.

(Resp. SMF ¶ 29).  When they saw the lights from Officer Liggio's car parked at the Jennifer

Convertibles store, they ran back toward the Kia.  (*Id.* ¶¶ 29–30 & 33).  At that moment, Officer

Nutland drove down the alleyway between the T-Mobile and Sleepy's stores and saw three men

running toward the back of the Sleepy's store.  (*Id.* ¶ 32).  The three men entered the Kia as Officer

Nutland continued to drive his car toward them.  (*Id.* ¶¶ 33–36).  Officer Nutland stopped his car

about two feet in front of the Kia at an angle closer to the passenger side.  (*Id.* ¶ 37; Pl. Supp. SMF

¶¶ 22–25; Def. Supp. SMF ¶¶ 34–36).



(D.E. No. 102-3, Plaintiff's Diagram of Scene).

Officer Nutland got out of his car, stood by the driver's side door, and drew his weapon. (Resp. SMF ¶ 37; Pl. Supp. SMF ¶ 22; Def. Supp. SMF ¶ 39).  He gave verbal commands to the four men in the Kia to the effect that they were under arrest and to show him their hands.  (Resp. SMF ¶¶ 41–42; D.E. No. 89-7 ("Nutland Dep.") at 53:16–20).  None of the men complied; instead, the Kia reversed.  (Resp. SMF ¶ 45; D.E. No. 89-6 ("Felix Decl.") ¶ 4).  Officer Nutland, fearing for his life, opened fire.  (Resp. SMF ¶ 47; Felix Decl. ¶ 4; Nutland Dep. at 59:5–15).

While reversing, Reyes sustained one gunshot wound in the abdomen.  (Pl. Supp. SMF ¶ 34; Def. Supp. SMF ¶ 56; D.E. No. 89-12, Ex. L, Reconstruction Report ("Recon. Rep.") at App'x A; D.E. No. 89-4, Ex. D, Autopsy Report ("Autopsy Rep.") at 8).  As the above diagram depicts, the Kia then drove forward and turned to its right toward Officer Nutland and the alleyway.  (D.E. No. 102-3, Plaintiff's Diagram of Scene; Pl. Supp. SMF ¶ 36; Def. Supp. SMF ¶ 58).  Officer Nutland continued firing toward the Kia's windshield.  (Pl. Supp. SMF ¶ 36; Def. Supp. SMF ¶ 58; Recon. Rep. at App'x F).  Reyes sustained two additional gunshot wounds, one in his right shoulder and one in his right elbow.  (Recon. Rep. at App'x B–C; Autopsy Rep. at 8).  At this point, a total of nine bullets had struck the Kia.  (*See* Recon. Rep. at App'x F).  A reconstruction report labels these initial nine bullets as Bullets A through I.  (*See id.*).

Subsequently, Reyes continued to drive the Kia toward the alleyway.  (Resp. SMF ¶ 70).  Reyes turned left into the alleyway, lost control of the car, and crashed into the side window of the Sleepy's store.  (*Id.*).  Officer Nutland proceeded on foot toward the alleyway and approached the Kia.  (*Id.* ¶¶ 75–78; Nutland Dep. at 71:11–22).  He fired the final bullet at the Kia's driver's side window.  (Resp. SMF ¶ 85; Recon. Rep. at App'x F & H).  The final bullet grazed Reyes's chest. (Pl. Supp. SMF ¶ 42; Def. Supp. SMF ¶ 85; Recon. Rep. at App'x D.  The reconstruction report labels the final bullet as Bullet J.  (Recon. Rep. at App'x F & H).

Officer Nutland claims that, before firing Bullet J, he saw Reyes turn his left shoulder toward Officer Nutland to face him as he approached the driver's side of the Kia. (Resp. SMF ¶ 79; Nutland Dep. at 71:6–72:13). He claims that he then saw Reyes abruptly lift his right hand over his left shoulder, which made him think Reyes was about to use a firearm. (Resp. SMF ¶¶ 81–84; Nutland Dep. at 72:19–73:21). However, Plaintiff disputes these facts, and contends that because the reconstruction report shows that the final bullet grazed Reyes's chest, Reyes had to have had both shoulders pinned back against the driver's seat—as opposed to having his shoulders turned over to face Officer Nutland—when Officer Nutland fired the final bullet. (Resp. SMF ¶ 79; Recon. Rep. at App'x I).

After Officer Nutland fired the final bullet, Reyes backed out of the Sleepy's, proceeded toward Route 4, and crashed into the highway divider. (Resp. SMF ¶ 86). Reyes got out of the Kia, jumped over the divider, and ran across Route 4. (*Id.* ¶ 88). Officer Nutland apprehended the three remaining passengers of the Kia. (*Id.* ¶¶ 90–91). Reyes was found by police not far from the scene. (*Id.* ¶ 95). He was treated at the scene and transported to a hospital, where he died soon after from "multiple gunshot wounds." (*Id.* ¶¶ 96–97; Autopsy Rep. at 8).

On October 7, 2016, Plaintiff initiated this action, asserting claims for excessive force and wrongful death. (Compl. ¶¶ 26–29 & 36–40). On January 8, 2020, Defendant moved for summary judgment. (D.E. No. 85; *see also* D.E. No. 85-3 ("Mov. Br."); D.E. No. 86 ("Opp."); D.E. No. 90 ("Reply")). On May 27, 2021, the Court held a teleconference to address various issues with the parties' submissions, including the absence of certain pertinent facts. (D.E. No. 99, May 27, 2021 Proceeding Transcript, at 7:6–13 & 8:6–10:9). The Court ordered the parties to file a joint statement of undisputed facts, as well as supplemental briefs. (*Id.* at 22:19–23:5 & 28:2–10). The parties filed supplemental briefs on July 16 and July 30, 2021, respectively. (D.E. No. 100-1

("Supp. Mov. Br.") & D.E. No. 101 ("Supp. Opp."). However, the parties failed to file a joint

statement of undisputed facts—instead, each party filed a separate supplemental statement of facts.

(*See* Pl. Supp. SMF & Def. Supp. SMF).[4] The Court is prepared to rule.

## II.    LEGAL STANDARD

Summary judgment is appropriate if the moving party shows that there is "no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The moving party must first show that no genuine issue of material fact exists.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court's role is not to evaluate the evidence

and decide the truth of the matter, but to determine whether there is a genuine dispute of a material

fact for trial. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986). An issue is "genuine" if

it is supported by evidence such that a reasonable jury could return a verdict in the non-moving

party's favor. *Id.* at 248. A fact is "material" if it "might affect the outcome of the suit under the

governing law." *Id.* The Court must consider all facts and their reasonable inferences in the light

---

[4]    The Court notes that Officer Nutland initially disputed Plaintiff's recitation of the facts with respect to Bullets A through I. Specifically, Officer Nutland testified to the following: after the Kia reversed, it accelerated toward him, and as he opened fire, the Kia struck him in the legs, forcing him onto its hood. (Nutland Dep. at 59:2–61:23; Def. Supp. SMF ¶ 62). The Kia then stopped abruptly, causing him to fall off the hood and strike his head; the Kia then ran over his legs, dragged him underneath the vehicle, and ran over his legs again before he got on his feet. (Nutland Dep. at 61:24–62:2; 63:2–65:20; 67:6–68:6 & 69:7–8; Resp. SMF ¶¶ 57–68 & 75). Plaintiff disputes these facts. (Resp. SMF ¶¶ 52 & 57–69; Pl. Supp. SMF ¶ 37; Felix Decl. ¶ 5). Officer Nutland also initially asserted that after he opened fire, the Kia struck his vehicle, which Plaintiff also disputes. (Resp. SMF ¶ 51; Pl. Supp. SMF ¶ 36). However, for purposes of this motion, Officer Nutland submits that he accepts Plaintiff's recitation of the facts. (Reply at 7; Supp. Mov. Br. at 5). Specifically, Officer Nutland agrees that he "was not on the hood of the Kia at any time while Reyes was driving, nor did the Kia drive over him." (Def. Supp. SMF ¶ 63). Officer Nutland further agrees that the Kia did not strike his vehicle. (*Id.* ¶ 61).

In addition, the Court notes that it does not address Officer Nutland's argument in Point III of his supplemental brief. (*See* Supp. Mov. Br. at 26–32). He appears to argue that because Hector testified that he ducked down in the front passenger's seat once Officer Nutland opened fire, he could not see what was happening and therefore cannot testify with personal knowledge as to whether Officer Nutland was on the hood of the Kia or whether the Kia drove over him. (*See id.* at 26). Not only did Hector testify that his head remained above the dashboard after he ducked down so that he could still see in front of the Kia (*see* D.E. No. 89-5, Deposition of Hector Felix, at 79:3-21)), but, as previously noted, for purposes of this motion, Officer Nutland agrees that he "was not on the hood of the Kia at any time while Reyes was driving, nor did the Kia drive over him." (Def. Supp. SMF ¶ 63).

most favorable to the nonmoving party.  *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.

1995).

## III.    DISCUSSION

### A.    Excessive Force

Officer Nutland claims he is entitled to qualified immunity on Plaintiff's excessive force

claims under § 1983 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, *et seq.* ("NJCRA").

(Mov. Br. at 3–25; Supp. Mov. Br. at 8–26).  Qualified immunity under § 1983 and the NJCRA

share the same standards.  *See Faragalla v. Jersey City*, No. 17-03604, 2020 WL 5812798, at *12

(D.N.J. Sept. 30, 2020); *see also Brown v. State*, 165 A.3d 735, 743 (N.J. 2017); *Morillo v. Torres*,

117 A.3d 1206, 1209 (N.J. 2015).  Accordingly, the Court does not differentiate between the claims

for purposes of the qualified immunity analysis.

"Police officers, embodying the authority of the state, are liable under § 1983 when they

violate someone's constitutional rights, unless they are protected by qualified immunity."  *Peroza-*

*Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (quoting *Santini v. Fuentes*, 795 F.3d 410, 416–

17 (3d Cir. 2015)).  The burden of establishing entitlement to qualified immunity rests with the

movant asserting the defense.  *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014).  "The qualified

immunity inquiry contains two prongs: (1) whether the facts alleged by the plaintiff show the

violation of a constitutional right, and (2) whether the law was clearly established at the time of

the violation."  *Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021).  Courts are "permitted to exercise

their sound discretion in deciding which of the two prongs of the qualified immunity analysis

should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v.*

*Callahan*, 555 U.S. 223, 236 (2009).

The second prong involves a two-part inquiry.  First, a court "must define the right allegedly violated at the appropriate level of specificity.  This requires [a court] to frame the right in light of the specific context of the case, not as a broad general proposition." *Jefferson*, 21 F.4th at 81 (quoting *Peroza-Benitez*, 994 F.3d at 165).  Second, a court "must ask whether that right was 'clearly established' at the time of its alleged violation, *i.e.*, whether the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Peroza-Benitez*, 994 F.3d at 165).  This is an objective standard, and the officer's subjective beliefs are irrelevant. *Id.*  To determine whether the law was "clearly established" at the time of the events at issue, a court should first look to factually analogous Supreme Court and Third Circuit precedent.  *Peroza-Benitez*, 994 F.3d at 165.  Next, a court may look to whether there is a "robust consensus of cases of persuasive authority in the Courts of Appeals." *Id.* (quoting *Fields v. City of Phila.*, 862 F.3d 353, 361 (3d Cir. 2017)).  Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).  "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  "[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." *In re City of Philadelphia Litig.*, 49 F.3d 945, 961–62 (3d Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Without addressing whether a reasonable jury could find that Officer Nutland engaged in excessive force, the Court holds that he is entitled to qualified immunity for the first nine bullets he fired, Bullets A through I.  The Court, however, reaches a different conclusion for the final

bullet, Bullet J.  As the Third Circuit recently stated, "[i]f an individual has engaged in risky flight, but no longer is threatening to officers or the public, the use of deadly force against the individual may no longer be reasonable."  *Jefferson*, 21 F.4th at 86.

*Bullets A–I*.  Before firing the first nine bullets, Officer Nutland was faced with four men in a vehicle, three of whom he had just witnessed fleeing the scene of a reported break-in.  The men refused his commands to surrender, despite the fact that his weapon was drawn while standing approximately two feet in front of the vehicle.  The vehicle then reversed into a tight parking space toward a guardrail.  At that point, Officer Nutland fired his weapon in anticipation that the vehicle might drive forward and be used as a weapon against him.  Accordingly, to overcome Officer Nutland's qualified immunity, the law must clearly establish that Officer Nutland could not fire his weapon under these circumstances.  In other words, the law must clearly establish that an officer may not use deadly force against an individual, accompanied by several cohorts in a suspected break-in, who disregards the officer's commands to surrender and reverses his vehicle into a tight space while the officer is standing in its immediate trajectory.

Neither party has identified Supreme Court or Third Circuit precedent that places beyond debate the illegality of Officer Nutland's conduct under the circumstances described above.  The Supreme Court has set forth general precepts concerning the use of deadly force against a suspect.  Generally, whether force is objectively reasonable depends on the "severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officer or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally

unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

The Supreme Court in *Brosseau* considered the qualified immunity defense where an officer first chased, on foot, a suspect in a reported domestic disturbance until the suspect eventually entered a vehicle. 543 U.S. at 195–96. The officer approached the vehicle's driver's side window and commanded the suspect to surrender; the suspect ignored the officer's commands and instead attempted to start the car. *Id.* at 196. After a struggle, the suspect started the car. *Id.* Concerned for the safety of others, the officer "jumped back" from the car as it "started or shortly after it began to move" and opened fire at the driver through the rear driver's side window, shooting him in the back. *Id.* at 196–97. The Supreme Court held that the officer was entitled to qualified immunity because the law did not clearly establish that "shoot[ing] a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight," was contrary to law. *Id.* at 200–01. Because *Brosseau* held that the officer's conduct was *not* contrary to clearly established law, it does not clearly establish that Officer Nutland's conduct was contrary to law so as to place the question beyond debate. If anything, *Brosseau* appears to support Officer Nutland's conduct. While Officer Nutland was not standing at the Kia's driver's side window, he was standing in the immediate trajectory of a noncompliant suspect's vehicle when it reversed into a tight parking space; an officer in such a position has reason to believe the suspect is set on avoiding capture by vehicular flight and that such flight poses a risk to the officer.

As for Third Circuit precedent, the Court analyzes *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), *Jefferson*, 21 F.4th 74, *Davenport v. Borough of Homestead*, 870 F.3d 273 (3d Cir. 2017), and *Bland v. City of Newark*, 900 F.3d 77 (3d Cir. 2018). Each case is a reported Third Circuit

decision that touches upon the extent to which an officer may use deadly force against a suspect engaged in vehicular flight.  Each case, however, is materially distinguishable.

The Third Circuit in *Abraham* considered excessive force claims where an off-duty police officer shot a suspected shoplifter as he attempted to flee in his vehicle.  183 F.3d at 282–83.  Several issues were disputed, including where the officer was positioned; how chaotic the pursuit was; the speed of the suspect's vehicle; and whether the officer was in danger of being run over.  *Id.* at 283–85.  However, the "shot indisputably came through the driver's side window."  *Id.* at 293.  The Third Circuit reversed the district court for impermissibly relying solely on the officer's version of events—that the suspect "'recklessly' drove in reverse at 'a high rate of speed' with people in 'close proximity' before he 'rammed' into a parked car."  *Id.* at 292.  The Third Circuit noted that a jury could ultimately find that the officer did not open fire until it was no longer objectively reasonable for her to believe she was in danger, and "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."  *Id.* at 294.  Therefore, the Third Circuit held that material disputes as to whether deadly force under the circumstances was objectively reasonable precluded summary judgment.  *Id.*  Unlike the district court in *Abraham*, the Court here accepts Plaintiff's reasonably established version of events.  However, under that version, Officer Nutland was standing in the immediate trajectory of a noncompliant suspect's vehicle as it reversed into a tight parking space, and he opened fire in anticipation that the vehicle would drive forward.  *Abraham*, meanwhile, involved a situation where an officer fired her weapon at an individual whom, a reasonable jury could find, no longer posed a threat.  Accordingly, *Abraham* does not clearly establish that Officer Nutland's conduct was contrary to law so as to place the question beyond debate.

The Third Circuit in *Jefferson* considered the qualified immunity defense in a dispute arising from a high-speed chase that ensued after an officer noticed the suspect in a suspected stolen vehicle. 21 F.4th at 76–77. The suspect's vehicle eventually struck a fire hydrant, and several officers who had joined the chase surrounded the suspect's vehicle on the left and right sides. *Id.* at 77. The suspect reversed, striking a police vehicle before attempting to turn back onto the street from which he had arrived. *Id.* An additional officer arrived at the scene during this maneuver and opened fire as the suspect's vehicle passed in front of him. *Id.* The Third Circuit concluded that a reasonable jury could find that the officer was not in danger of being struck by the suspect's vehicle when he opened fire. *Id.* at 79. Therefore, the Third Circuit held that fact issues remained as to whether the officer's use of deadly force was objectively reasonable. *Id.* at 80. Importantly, the Third Circuit noted that it was clearly established in 2014 that "law enforcement officers may—under certain conditions—be justified in using deadly force against the driver of a car when they are in the car's trajectory and have reason to believe that the driver will imminently and intentionally run over them." *Id.* at 82 (quoting *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019)). The Third Circuit also explained that an "otherwise non-threatening individual . . . engaged in vehicular flight is entitled to be free from being subjected to deadly force if it is unreasonable for an officer to believe his or others' lives are in immediate jeopardy from their actions." *Id.* at 85–86. Because a reasonable jury could find that the officer was confronted with the latter situation, the Third Circuit held that the officer was not entitled to qualified immunity. *Id.* at 86. Unlike in *Jefferson*, Officer Nutland was standing in the immediate trajectory of a noncompliant suspect's vehicle as it reversed into a tight parking space; an officer in such a position has reason to believe that the vehicle would imminently and intentionally drive

forward and strike him.  Therefore, *Jefferson* does not clearly establish that Officer Nutland's conduct was contrary to law so as to place the question beyond debate.

In *Davenport*, the Third Circuit considered a qualified immunity challenge where an officer shot at a fleeing vehicle from the side during a car chase in an area with high-pedestrian traffic. 870 F.3d at 280–81.  The Third Circuit held that the officer was entitled to qualified immunity "[g]iven the serious threat of immediate harm" to pedestrians.  *Id.* at 281; *see also Bland*, 900 F.3d at 84 (holding officers were entitled to qualified immunity because deadly force under the circumstances—a high-speed chase that "threatened the safety of the officers as well as the public at large"—was *consistent* with clearly established law).  Both *Davenport* and *Bland* appear to support Officer Nutland's conduct.  While the facts at issue do not include a car chase in high-pedestrian traffic, Officer Nutland did indeed objectively seek to eliminate the serious threat of immediate harm posed by the Kia reversing into a tight parking space while he stood in its trajectory.  Therefore, because both *Davenport* and *Bland* held that the conduct at issue in those cases was *consistent* with clearly established law, neither case renders Officer Nutland's conduct clearly unlawful.

The parties cite two other unreported Third Circuit decisions that touch upon the extent to which an officer may use deadly force against a suspect engaged in vehicular flight.  (*See* Opp. at 36; Supp. Mov. Br. at 23; Supp. Opp. at 17).  While one case has distinguishable facts, the other case actually supports Officer Nutland's conduct.

In an unreported decision cited by Plaintiff, *Eberhardinger v. City of York*, 782 F. App'x 180, 183–85 (3d Cir. 2019), the Third Circuit relied on *Abraham* in determining that the use of deadly force against fleeing felons who *do not* pose a threat to officers or others is unreasonable.  There, the officer—"standing to the left of the slow-moving vehicle and apparently

out of harm's way—fired four shots at the driver as the vehicle was passing him or had completely passed him."  *Id.* at 182.  The Third Circuit noted that *Abraham* "clearly established" that such conduct was contrary to law.  *Id.* at 183.  *Eberhardinger* is distinguishable because, as explained above, the level of danger that Officer Nutland confronted was materially higher than that posed by a slow-moving vehicle passing an officer.  Therefore, *Eberhardinger* does not clearly establish that Officer Nutland's conduct was contrary to law.

In an unreported decision cited by Defendant, *Martin for Estate of Webb v. City of Newark*, 762 F. App'x 78, 80 (3d Cir. 2018), the Third Circuit considered the qualified immunity defense where an officer commanded the suspect not to start the car while the officer stood in the open driver's side door of the suspect's vehicle.  The suspect started the car, and the officer opened fire. *Id.*  The Third Circuit held that the officer's conduct was *consistent* with clearly established law:

> Wilson was faced with an erratic and noncompliant driver who disregarded his explicit warning not to start the car, despite Wilson's proximity to, and presence (of at least his hands) within, the vehicle. Webb posed a threat to Wilson' life: being injured by a moving vehicle.  Even assuming that the car had not yet moved at the time of the shooting, a reasonable officer in Wilson's position would have feared for his life given Webb's bold actions.  Wilson need not have awaited movement of the car to protect himself.

*Id.* at 83 (citation omitted).  While *Webb* is unreported, it nonetheless held that the officer's use of deadly force in anticipation that a vehicle would be used as a deadly weapon was *consistent* with clearly established law.  *Webb*, therefore, appears to support Officer Nutland's conduct.

Accordingly, Third Circuit precedent does not clearly establish that Officer Nutland's conduct was contrary to law so as to place the question beyond debate.  Nor is there a consensus of decisions by the Courts of Appeals that places the question beyond debate.  Rather, the Courts of Appeals have "consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or

civilians immediately preceding the officer's use of deadly force." *McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009) (collecting cases); *see also Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014) ("An officer is justified in using deadly force against 'a driver who objectively appears ready to drive into an officer or bystander with his car.'" (quoting *Hermiz v. City of Southfield,* 484 F. Appx. 13, 16 (6th Cir. 2012))); *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) (holding officer was entitled to qualified immunity because there was reason to believe noncompliant suspect posed immediate threat where officer was standing in a slippery yard while suspect's vehicle accelerated around him).   Moreover, the Courts of Appeals have held that "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon"—such as a vehicle—"to act to stop the suspect."  *See Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007); *see also Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012) ("the law does not create a duty for a law enforcement officer to retreat or abandon his efforts to effect an arrest simply because a fleeing felon is noncompliant").

The remaining cases cited by Plaintiff do not lead to a contrary conclusion.  (*See* Opp. at 30–33 & Supp. Opp. at 17–18).  For example, in *Lytle v. Bexar County*, 560 F.3d 404, 412–17 (5th Cir. 2009), the Fifth Circuit held that factual issues as to whether the suspect's vehicle posed a threat to police during a motor vehicle chase precluded summary judgment on qualified immunity because a reasonable jury could find deadly force is unreasonable where an officer shoots the *rear* of a fleeing vehicle from "three or four houses away."  Unlike *Lytle*, Officer Nutland was standing in the trajectory of the Kia.  Therefore, *Lytle* does not clearly establish that the conduct at issue was contrary to law.  *See also Vaughan v. Cox*, 343 F.3d 1323, 1330–33 (11th Cir. 2003) (holding factual issues as to whether deadly force was necessary to prevent escape precluded summary judgment on qualified immunity because a reasonable jury could find deadly force unreasonable

where officer shot at a fleeing vehicle *from the side* during high-speed chase); *Smith v. Cupp*, 430 F.3d 766, 769–73 (6th Cir. 2005) (holding deadly force under the circumstances was contrary to law because the officer shot the suspect *after* he drove *passed* the officer and there was no immediate danger to anyone in the vicinity).   Again, because there is no genuine dispute that Officer Nutland stood in the trajectory of the Kia when he fired the first round of bullets, neither *Vaughan* nor *Smith* clearly establish that the conduct at issue was contrary to law.

Plaintiff's reliance on *Adams v. Speers*, 473 F.3d 989, 991–92 (9th Cir. 2007), is similarly unavailing.   (*See* Opp. at 32).   There, after running several stop signs, the suspect led police on a motor vehicle chase.   *Adams*, 473 F.3d at 991.   An officer rammed the suspect's vehicle twice and patrol cars surrounded the suspect's vehicle on all sides.   *Id.* at 991–92.   One officer approached on foot and struck the suspect's window with a baton; a second officer exited his vehicle and stood in front of the suspect's vehicle as it "rolled backwards."   *Id.* at 992.   Without warning, the second officer fired six rounds at the suspect's vehicle.   *Id.*   The Ninth Circuit affirmed the denial of qualified immunity because it found it "obvious" that "[n]o officer acting reasonably in these circumstances could have believed that he could use deadly force to apprehend" the suspect.   *Id.* at 993–94.   Unlike in *Adams*, the instant case is not the "obvious" one where no reasonable officer would believe deadly force was warranted.   The danger posed to Officer Nutland—who, alone, faced four noncompliant passengers suspected in a reported break-in while standing in the immediate trajectory of the vehicle as it reversed into a tight parking space—is materially greater than that posed to the officer who opened fire in *Adams*.   Thus, while the Ninth Circuit held that deadly force in the "obvious" case is contrary to law, it does not clearly establish that Officer Nutland's conduct was contrary to law so as to place the question beyond debate.

In conclusion, Plaintiff has not cited, nor could the Court uncover, a case that clearly establishes that Officer Nutland's conduct was contrary to law so as to place the question beyond debate.  Officer Nutland is therefore entitled to qualified immunity with respect to Bullets A through I.

***Bullet J.***  A different result is necessary for the final bullet, Bullet J.  Following the first nine bullets, Reyes drove the Kia toward the alleyway, turned left, lost control of the car, and crashed into the side window of the Sleepy's store.  Officer Nutland proceeded on foot toward the alleyway, saw that the Kia had crashed into the Sleepy's store window, and fired the final shot at Reyes through the driver's side window.  However, the circumstances under which Officer Nutland fired the final bullet are disputed.  According to Officer Nutland, Reyes turned his left shoulder toward Officer Nutland to face him, and abruptly lifted his right hand over his left shoulder, which made Officer Nutland think Reyes was about to use a firearm; in anticipated self-defense, he fired the final bullet.  (Resp. SMF ¶¶ 79 & 81–85; Nutland Dep. at 71:6–73:21).  According to Plaintiff, Officer Nutland's version of events is not possible because the reconstruction report shows that the final bullet grazed his chest, which necessarily means Reyes had both shoulders pinned back against the driver's seat, as opposed to turned over to face Officer Nutland.  (Resp. SMF ¶ 79; Recon. Rep. at App'x I).

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Reyes no longer posed an imminent threat to Officer Nutland when he fired the final bullet.  According to Plaintiff, Officer Nutland fired the final bullet when he was no longer standing in the vehicle's immediate trajectory, and the vehicle had crashed into the side of a building.  "Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished." *Lamont v. New Jersey*, 637

17

F.3d 177, 184 (3d Cir. 2011); *see also Lytle*, 560 F.3d at 413 ("an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased"). "A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect." *Abraham*, 183 F.3d at 294; *see also Ellis v. Wynalda,* 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.").

In short, the parties' dispute regarding the final bullet turns on the facts, not the law. Whether Reyes posed an objective threat of harm is indeed central to the qualified immunity analysis. "Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002). "[A] jury will have to make credibility judgments, and credibility determinations should not be made on summary judgment." *Abraham*, 183 F.3d at 294. Therefore, the Court concludes that genuine issues of material fact as to the circumstances under which Officer Nutland fired the final bullet preclude summary judgment as to that portion of events.[5]

## B.   Wrongful Death

Plaintiff asserts a claim for wrongful death against Officer Nutland based on both § 1983 and the New Jersey Wrongful Death Act, N.J.S.A. 2A:31-1, *et seq.* ("NJWDA"). (Compl. ¶¶ 38–40). Officer Nutland argues that Plaintiff's wrongful death claim is barred because (i) Plaintiff failed to file the mandatory notice of claim under the New Jersey Tort Claims Act,

---

[5]     Officer Nutland repeatedly relies on cases where officers were granted qualified immunity because the suspect appeared to abruptly reach for a weapon. (*See* Supp. Mov. Br. at 15–19 & 24–26 (citing *Lamont*, 637 F.3d at 180; *Slattery v. Rizzo*, 939 F.2d 213, 216–17 (4th Cir. 1991); *Anderson v. Russell*, 247 F.3d 125, 128 (4th Cir. 2001); *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991); and *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009))). But whether Reyes appeared to abruptly reach for a weapon is in dispute. The cases cited by Officer Nutland are therefore inapposite.

N.J.S.A. § 59:1-1, *et seq.* ("NJTCA"), which Plaintiff does not dispute (Resp. SMF ¶ 3); (ii) Officer Nutland is entitled to good faith immunity under the NJTCA; and (iii) alternatively, Plaintiff cannot establish a predicate wrongful act and thus Reyes could not have maintained a claim had he survived under the NJWDA.[6]  (*See* Mov. Br. at 25–30).  Plaintiff argues "[t]here is no notice of claim requirement," relying on the Supreme Court of New Jersey's decision in *Owens v. Feigin*, 947 A.2d 653 (N.J. 2008).  (Opp. at 39).  Plaintiff further argues his excessive force claims sufficiently establish a predicate wrongful act for purposes of his wrongful death claim. (*Id.*).

As a threshold matter, Plaintiff's wrongful death claim is not barred by the NJTCA's notice requirement.[7]  "[T]he NJTCA's notice requirements do not apply to federal claims, including § 1983 actions."  *County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 174 (3d Cir. 2006). Similarly, the Supreme Court of New Jersey specifically held in *Owens* that "the [NJ]TCA's notice-of-claim requirement does not apply to [NJ]CRA causes of action."  947 A.2d at 654. Because Plaintiff's wrongful death claim is based entirely on his excessive force claims under § 1983 and the NJCRA (*see* Compl. ¶ 38), the NJTCA's notice requirement does not apply.

---

[6]     The NJWDA provides:

> When the death of a person is *caused* by *a wrongful act*, *neglect or default*, such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury, the person who would have been liable in damages for the injury if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured and although the death was caused under circumstances amounting in law to a crime.

N.J.S.A. 2A:31-1 (emphasis added); *see also id.* at 2A:15-3 (granting administrators the right to recover damages for any trespass done to the person or property of the decedent as the decedent would have had if he was living).

[7]     Specifically, the NJTCA provides that "no action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter."  N.J.S.A. § 59:8-3(a).  The NJTCA provides specific notice requirements regarding time and content of claims.  *Id.* §§ 59:8-4 & 59:8-7–59:8-8.

Because Plaintiff's wrongful death claim is based entirely on his excessive force claims, the Court's analysis concerning qualified immunity governs.  Since Officer Nutland is entitled to qualified immunity on Plaintiff's excessive force claims with respect to the first nine bullets, Plaintiff cannot maintain a wrongful death claim for the first nine bullets because there is no underlying liability to establish a predicate wrongful act.  *See Gunter v. Twp. of Lumberton*, 535 F. App'x 144, 149 (3d Cir. 2013) (affirming summary judgment on derivative wrongful death claim after affirming summary judgment on underlying excessive force claim in favor of officers because "[a]ppellant could not establish the 'wrongful act' element of a wrongful death claim"); *see also Conde v. City of Atl. City*, 293 F.Supp.3d 493, 508 (D.N.J. 2017) (granting summary judgment on derivative wrongful death claim where officers were granted qualified immunity on underlying excessive force claim); *White v. City of Vineland*, 2018 WL 4583509, at *8 (D.N.J. Sept. 24, 2018) (noting derivative claims of wrongful death must be dismissed when the underlying claims have been dismissed).  Conversely, genuine disputes of material fact preclude qualified immunity with respect to the final bullet.  *See Mantz v. Chain*, 239 F. Supp. 2d 486, 508 (D.N.J. 2002) ("The same 'objective reasonableness' standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. § 59:3–3."); *see also Brittingham v. City of Camden*, No. 07-0190, 2009 WL 3151321, at *5 n.1 (D.N.J. Sept. 23, 2009).  Based on the parties' briefing and the current record, Plaintiff's wrongful death claim may proceed insofar as it is based on the final bullet.[8]  Accordingly, Officer Nutland's motion for summary judgment on Plaintiff's wrongful death claim, to the extent that it is based on the final bullet, is denied.

---

[8]     It is not clear that the final bullet, which grazed Reyes's chest, was the cause of death so as to satisfy the causation element of the NJWDA.  In fact, Plaintiff asserts that the gunshot wound in Reyes's abdomen was the cause of death.  (Opp. at 5 & Supp. Opp. at 3).  However, the autopsy report indicates that the cause of death was not a

**IV.      CONCLUSION**

For the foregoing reasons, Officer Nutland's motion is **GRANTED in-part** and **DENIED in-part**.  An appropriate Order accompanies this Opinion.


**Dated:** November 28, 2022

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

---

specific gunshot wound, but "multiple gunshot wounds."  (*See* Autopsy Rep. at 8).  In any event, the parties do not address the issue of causation with specificity and it is not properly before the Court.